******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CATHERINE REVILLE *v.* JOHN REVILLE
(SC 18452)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh and McDonald, Js.*

*Argued February 19, 2013—officially released July 8, 2014*

*Steven D. Ecker*, with whom was *M. Caitlin S. Anderson*, for the appellant (plaintiff).

*Samuel V. Schoonmaker IV*, with whom were *Allen Gary Palmer* and, on the brief, *Wendy Dunne DiChristina* and *Anthony L. Cenatiempo*, for the appellee (defendant).

*Opinion*

ROGERS, C. J. This case concerns a spouse's duty to disclose an accrued but unvested pension during dissolution proceedings. The plaintiff, Catherine Reville, appeals[1] from the judgment of the trial court denying her motion to open a 2001 judgment dissolving her marriage to the defendant, John Reville, on the basis of fraud. The plaintiff alleged that the defendant committed fraud during predissolution settlement negotiations by failing to disclose an accrued but unvested pension benefit, either on his financial affidavits or otherwise. After finding, inter alia, that the defendant had disclosed the existence of the pension to the plaintiff orally, both during the parties' marriage and during settlement negotiations, the trial court denied the plaintiff's motion to open. The plaintiff claims on appeal that the trial court improperly: (1) held that the pension, at the time the parties' marriage was dissolved, definitively was not "property" subject to equitable distribution pursuant to General Statutes (Rev. to 2001) § 46b-81;[2] (2) refused to consider evidence of the pension's value, which undercut the court's findings regarding disclosure; and (3) required the plaintiff to bear the burden of proving fraud under the circumstances. We agree with the plaintiff's first two claims and, accordingly, reverse the judgment of the trial court.

The following facts, which either are undisputed or were found by the trial court, and procedural history are relevant to the appeal. On May 25, 2001, the trial court, *Hon. Dennis F. Harrigan*, judge trial referee, rendered judgment dissolving the parties' fourteen year marriage, and it incorporated into the judgment orders of alimony, child support and an equitable distribution of the marital property consistent with the parties' written separation agreement. Pursuant to that agreement, the parties had endeavored to split their assets equally. The plaintiff filed an amended postjudgment motion to open and set aside the dissolution judgment, dated September 15, 2005, claiming that the court should revisit the issue of property distribution because the defendant, a partner with PricewaterhouseCoopers LLP, had failed to disclose on all four of his financial affidavits the existence of an accrued but unvested pension (pension).[3] The plaintiff claimed further that she had relied on those affidavits and the representations contained therein as to the extent and scope of the defendant's assets, and that the pension that he had failed to disclose had a substantial value, likely in excess of $2 million. According to the plaintiff, had she known of the existence of the pension, she would not have entered into the separation agreement as it was written because it made no provision for her to receive an interest in the pension or some other compensation for waiving her right to such an interest. The plaintiff contended that interests in unvested pensions were,

around the time of the parties' divorce, "property or assets" required to be disclosed on financial affidavits in dissolution actions and subject to distribution pursuant to § 46b-81. By her motion to open, the plaintiff also sought to enforce a penalty provision in the parties' separation agreement, which provided for a forfeiture of intentionally concealed property interests.

The trial court, *Shay, J.*,[4] decided, sua sponte, to bifurcate the proceedings on the plaintiff's motion to open the judgment into two phases. In the first phase, the court endeavored to determine whether, pursuant to § 46b-81, the pension was marital property at the time of the dissolution. In the event that the pension was determined to be property, a second phase would be held to determine whether the defendant had failed to disclose it, whether any such nondisclosure was fraudulent and whether nondisclosure would have altered the underlying judgment.[5]

During the first phase of the proceedings on the plaintiff's motion to open, the trial court heard testimony about the pension from the defendant and William Miller, an actuarial and pension expert retained by the plaintiff. The deposition of Roger Hindman, a partner in PricewaterhouseCoopers LLP, who oversaw benefit programs nationally for staff and partners of that firm, was read into the record. The evidence presented established the existence and nature of the pension generally, and the defendant's specific interest therein.

At the time of the dissolution judgment, the defendant was forty-five years old and had been employed by PricewaterhouseCoopers LLP, or one if its predecessors, for approximately twenty years, and he had been a partner in the firm for nearly one decade.[6] When the defendant became a partner, he was informed of the benefits associated with that position, which included the pension at issue among several other retirement savings vehicles.

The trial court found that the pension is unqualified, in the sense that it is not covered by the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. It is not funded on an ongoing basis by contributions to a trust fund, but rather, is paid out of the firm's current profits at the time it is due to eligible retirees. Moreover, although benefits accrue during an individual's term of employment, they do not immediately vest. Normal retirement age at PricewaterhouseCoopers LLP, is age sixty but, under the terms of the pension, a partner is eligible for a reduced benefit at age fifty with twenty years of service or a full benefit at age fifty-five. At the time of the dissolution judgment, the defendant's pension was unvested, but it became partially vested five years later in 2006, and fully vested by 2010. The terms of the pension are subject to change and were modified somewhat during the 1998 merger; see footnote 6 of this opinion; but pursuant to the post-

merger partnership agreement, preexisting partners' benefits, including the defendant's pension, were protected. The pension benefit is calculated using a formula that takes into account a partner's years of service and a figure representing 30 percent of the average pay in his or her five highest earning years, but it is subject to a cap pursuant to which total pension payments to retired partners cannot exceed 15 percent of the firm's current profits. In addition, the pension is subject to forfeiture if a retired partner violates certain conditions such as a noncompete requirement. The defendant testified that he was unaware of any retired partner not receiving the pension benefit, provided he or she complied with those conditions.

Although all partners were aware of the pension and its basic terms, there was no written document memorializing those terms until April, 2003. In April, 2000, however, a personalized, electronic projection report was made available to each partner, including the defendant, through his or her work computer. That report estimated the present and future values of the available benefit plans, including the pension, by employing certain assumptions as to the rate of return, life expectancy and earnings growth. If a partner chose, he or she could enter alternative assumptions and change the projections. Employing the default assumptions, which included a retirement age of sixty, the projection report, as of December 31, 1999, estimated the present value of the defendant's projected retirement income stream to be $3,839,117.

After the first phase of the proceedings, the trial court made findings that included the foregoing facts and concluded that, in May, 2001, at the time of the decree dissolving the parties' marriage, the defendant's pension was not property subject to distribution pursuant to § 46b-81. In so concluding, the court reasoned that this court's decision in *Bender* v. *Bender*, 258 Conn. 733, 785 A.2d 197 (2001), which held that a party's unvested pension benefits were distributable marital property pursuant to § 46b-81, was inapplicable to the analysis here because that decision postdated the dissolution judgment in this case by several months. Moreover, according to the trial court, the pension unquestionably was not property under the law in effect prior to *Bender*. The trial court held, nevertheless, that the defendant should have disclosed the pension on his financial affidavits because nondisclosure prevented Judge Harrigan from performing his duty, mandated by General Statutes § 46b-66,[7] to find the parties' settlement agreement fair and equitable under the circumstances, and/or from giving consideration to the pension when fashioning his award of alimony. See General Statutes (Rev. to 2001) § 46b-82.[8]

The trial court then proceeded to the second phase of the proceedings on the motion to open the judgment.

During that phase, the trial court ruled that, in light of its earlier determination that the pension was not property, any evidence as to its value was not relevant or material. Accordingly, the trial court refused to admit such evidence when it was offered by the plaintiff.

During the second phase, there was substantial testimony from both parties as well as individuals who had represented or assisted them during the dissolution proceedings. The plaintiff testified that she was unaware of the pension during the parties' marriage, and further, that it was not disclosed to her during the extensive settlement negotiations attendant to the dissolution proceedings. The plaintiff's counsel during the dissolution proceedings, Anthony Piazza, confirmed the plaintiff's account of nondisclosure. The plaintiff's expert witness, Mark Harrison, an attorney and a certified public accountant, was familiar with the pension, but could not recall whether he had heard about it during the parties' case or when he was engaged in a different, later dissolution action involving another PricewaterhouseCoopers LLP partner.

The defendant testified that he and the plaintiff had discussed the pension during their marriage, and that he and his counsel disclosed the pension to the plaintiff and her representatives several times during settlement negotiations. According to the defendant, prior to the dissolution judgment, he had not accessed the April, 2000 electronic projection report made available to him at work that predicted the value of the pension based on certain assumptions. The defendant testified further that he was aware of the pension, but made an affirmative decision not to list it on his financial affidavit after discussing the matter with his counsel, because he did not believe it was an asset. The defendant's counsel at the dissolution proceedings, Christopher Burdett, confirmed the defendant's account in regard to disclosure of the pension during negotiations and the decision to omit it from the affidavit. Anthony Artabane, a colleague of the defendant's who was present at the settlement negotiations,[9] also testified that the pension had been discussed with the plaintiff.

Although the settlement negotiations preceding the dissolution of the parties' marriage had lasted sixteen months and produced more than twenty drafts of their settlement agreement, the defendant did not produce any written or documentary evidence demonstrating disclosure of the pension to the plaintiff. Additionally, Burdett did not have any notes or records indicating that the pension had been discussed orally with the plaintiff or her representatives.

After considering the conflicting testimony, the trial court found that the defendant's version of events was more credible than the plaintiff's version. The court found it implausible that the pension had not been discussed during the parties' marriage, and concluded that

the plaintiff "knew about the [pension] at the time of the dissolution of [the] marriage in 2001, and that she now wishes to change the bargain she reached with the advice of counsel and her expert." According to the court, although the defendant did not disclose the pension on his financial affidavits, he did so during settlement negotiations, and the plaintiff and her counsel knew about it. The court held, therefore, that the plaintiff had not proven her claim of fraud.

The trial court reiterated its view that, although the pension did not qualify as distributable property, the defendant still should have disclosed it on his affidavit to enable Judge Harrigan, the dissolution court, to determine whether the settlement was fair and equitable. It concluded, however, that the defendant's nondisclosure to the court "was not fraudulent, and in any event, would not likely have changed the outcome of the court's finding of fairness or produced a different result." Consequently, the trial court denied the plaintiff's amended motion to open the judgment.[10] This appeal followed.

The plaintiff claims that the trial court improperly concluded that, in May, 2001, the defendant's pension was not property within the meaning of § 46b-81 that he was required to disclose on his financial affidavit. She contends further that the court improperly excluded, or failed to consider, evidence of the pension's value during the second phase of the proceedings on the motion on the basis that such evidence was irrelevant because the pension was not property, and that these improper rulings tainted the court's findings as to disclosure. Finally, the plaintiff claims that the trial court should not have placed the burden of proving fraud on her under the particular circumstances of the case, namely, when the defendant has failed to disclose a substantial asset on his financial affidavits during a dissolution proceeding.

The defendant contends in response that the trial court correctly concluded that the pension was not distributable property. He argues additionally that the court properly denied the plaintiff's motion to open the judgment because the plaintiff failed to prove fraud. According to the defendant, the court's finding that the pension was disclosed orally to the plaintiff is supported by the testimonial evidence and was fatal to the plaintiff's motion. The defendant claims further that, although the pension's value was irrelevant, there nevertheless was evidence in this regard before the court. Finally, the defendant contends, the court's allocation of the burden of proof was not in error.

We begin with the general standard of review and an overview of the legal framework that governed the trial court proceedings. "Our review of a court's denial of a motion to open [based on fraud] is well settled. We do not undertake a plenary review of the merits of a deci-

sion of the trial court to grant or to deny a motion to open a judgment. . . . In an appeal from a denial of a motion to open a judgment, our review is limited to the issue of whether the trial court has acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. . . . The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did." (Internal quotation marks omitted.) *Weinstein* v. *Weinstein*, 275 Conn. 671, 685, 882 A.2d 53 (2005).

Pursuant to General Statutes § 52-212a, "a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . ." An exception to the four month limitation applies, however, if a party can show, inter alia, that the judgment was obtained by fraud. See *Weiss* v. *Weiss*, 297 Conn. 446, 455, 998 A.2d 766 (2010).

"Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. . . . A marital judgment based upon a stipulation may be opened if the stipulation, and thus the judgment, was obtained by fraud." (Internal quotation marks omitted.) *Weinstein* v. *Weinstein*, supra, 275 Conn. 685.

"Fraud by nondisclosure, which expands on the first three of [the] four elements [of fraud], involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there is a duty to speak. . . . A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment. . . . In a marital dissolution case, the requirement of a duty to speak is imposed by Practice Book § [25-30], requiring the exchange and filing of financial affidavits . . . and by the nature of the marital relationship." (Citations omitted.) *Gelinas* v. *Gelinas*, 10 Conn. App. 167, 173, 522 A.2d 295, cert. denied, 204 Conn. 802, 525 A.2d 965 (1987), overruled on other grounds by *Billington* v. *Billington*, 220 Conn. 212, 595 A.2d 1377 (1991).

"There are three limitations on a court's ability to grant relief from a dissolution judgment secured by fraud: (1) there must have been no laches or unreason-

able delay by the injured party after the fraud was discovered; (2) there must be clear proof of the fraud; and (3) there is a [reasonable probability][11] that the result of the new trial will be different." (Footnote added; internal quotation marks omitted.) *Weinstein* v. *Weinstein*, supra, 275 Conn. 685.

"To determine whether there [is] proof of fraud, [a court should] consider the evidence through the lens of our well settled policy regarding full and frank disclosure in marital dissolution actions. Our [rules of practice have] long required that at the time a dissolution of marriage, legal separation or annulment action is claimed for a hearing, the moving party shall file a sworn statement . . . of current income, expenses, assets and liabilities, and pertinent records of employment, gross earnings, gross wages and all other income. . . . The opposing party is required to file a similar affidavit at least three days before the date of the hearing . . . .

"Our cases have uniformly emphasized the need for full and frank disclosure in that affidavit. A court is entitled to rely upon the truth and accuracy of sworn statements required by . . . the [rules of practice], and a misrepresentation of assets and income is a serious and intolerable dereliction on the part of the affiant which goes to the very heart of the judicial proceeding. . . . These sworn statements have great significance in domestic disputes in that they serve to facilitate the process and avoid the necessity of testimony in public by persons still married to each other regarding the circumstances of their formerly private existence. . . .

"Moreover, in *Monroe* v. *Monroe*, [177 Conn. 173, 182, 413 A.2d 819, appeal dismissed, 444 U.S. 801, 100 S. Ct. 20, 62 L. Ed. 2d 14 (1979)], we referred to the requirement of full and frank disclosure between attorney and marital client. [L]awyers who represent clients in matrimonial dissolutions have a special responsibility for full and fair disclosure, for a searching dialogue, about all of the facts that materially affect the client's rights and interests. Id., 183. In *Baker* v. *Baker*, 187 Conn. 315, 322, 445 A.2d 912 (1982), we imposed this requirement of honest disclosure between the litigating parties and the court. It is a logical extension of those precedents to require such full and frank disclosure as well between the marital litigants themselves. . . .

"We have recognized, furthermore, in the context of an action based on fraud, that the special relationship between fiduciary and beneficiary compels full disclosure by the fiduciary. . . . Although marital parties are not necessarily in the relationship of fiduciary to beneficiary, we believe that no less disclosure is required of such parties when they come to court seeking to terminate their marriage.

"Finally, the principle of full and frank disclosure

. . . is essential to our strong policy that the private settlement of the financial affairs of estranged marital partners is a goal that courts should support rather than undermine. . . . That goal requires, in turn, that reasonable settlements have been knowingly agreed upon. . . . Our support of that goal will be effective only if we instill confidence in marital litigants that we require, as a concomitant of the settlement process, such full and frank disclosure from both sides, for then they will be more willing to [forgo] their combat and to settle their dispute privately, secure in the knowledge that they have all the essential information. . . . This principle will, in turn, decrease the need for extensive discovery, and will thereby help to preserve a greater measure of the often sorely tried marital assets for the support of all of the family members." (Internal quotation marks omitted.) *Weinstein* v. *Weinstein*, supra, 275 Conn. 686–87.

We now turn to the plaintiff's claims. Additional facts and procedural history will be provided when necessary.

## I

The plaintiff claims first that the trial court improperly held that the defendant's pension, at the time of the May, 2001 dissolution judgment, was not property subject to distribution under § 46b-81. She contends that the trial court should have held to the contrary by applying this court's decision in *Bender* v. *Bender*, supra, 258 Conn. 736, which established that unvested pension benefits were distributable property, but improperly chose instead to provide an unwarranted critique of the majority opinion in that case and to follow the dissenting opinion. According to the plaintiff, the trial court should have applied this court's holding in *Bender* retroactively because in May, 2001, it was a foreseeable decision that affirmed an already existing, consistent opinion of the Appellate Court and predictably built upon prior case law. In any event, the plaintiff claims, the real question before the trial court was not whether *Bender* ought to apply retroactively, but whether the defendant violated his fundamental obligation of full and frank disclosure, and the court's inordinate focus on *Bender* "established a deeply flawed framework for the ultimate resolution of this case." She contends that, because the trial court analyzed her fraud claim using a flawed legal framework, its factual findings also are faulty.

The defendant contends in response that the trial court correctly held that an unvested pension was not distributable property prior to this court's decision in *Bender*. According to the defendant, the Appellate Court's decision in that case, *Bender* v. *Bender*, 60 Conn. App. 252, 758 A.2d 890 (2000), aff'd, 258 Conn. 733, 785 A.2d 197 (2001), which predated the dissolution of the parties' marriage, did not address the issue, and this

court's subsequent decision represented a substantial and unexpected change in our equitable distribution jurisprudence that should not apply retroactively to May, 2001.

Although we disagree that our decision in *Bender* effected a substantial and surprising change to the law of marital property distribution, we nevertheless agree with the defendant that the decision does not apply retroactively to cases that were not pending at the time the decision was rendered. We disagree, however, with the trial court's determination that the law preexisting *Bender* established definitively that the defendant's pension was *not* distributable marital property in May, 2001, and that *Bender* represented a sharp departure from, rather than a progressive outgrowth of, our preexisting jurisprudence. In short, at the time of the parties' divorce, the proper treatment of unvested pensions in dissolution actions was an unsettled issue in Connecticut. More fundamentally, however, we disagree with the trial court's view that the question of whether the defendant's pension definitively was established to be distributable property in May, 2001, was a necessary preliminary issue to be decided in this action alleging fraudulent nondisclosure. Specifically, as the plaintiff contends, and as the trial court belatedly acknowledged, the defendant was legally obligated to disclose the existence and characteristics of the pension to the plaintiff and the dissolution court *regardless* of whether it clearly was distributable property. Moreover, the plaintiff's ability to prove that she had been defrauded was not dependent on her establishing that, had she known about the pension in May, 2001, she necessarily would have been awarded some portion of it. At the same time, in light of the state of the law at the time, it is entirely possible that the plaintiff would have been awarded a share of the pension or other property in lieu of a share. As explained more fully hereinafter, we agree with the plaintiff that the trial court's inordinate focus on *Bender*, and the nonissue of whether the pension definitively was or was not marital property in May, 2001, distorted the remainder of the trial and led the court to commit reversible evidentiary error.

We first note the applicable standard of review. As a general matter, the question of whether a particular retirement benefit constitutes distributable property pursuant to § 46b-81 is a question of statutory interpretation. Accordingly, our review of the trial court's decision is plenary. See *Mickey* v. *Mickey*, 292 Conn. 597, 613, 974 A.2d 641 (2009); *Bender* v. *Bender*, supra, 258 Conn. 741; *Krafick* v. *Krafick*, 234 Conn. 783, 793–94, 663 A.2d 365 (1995).

The following additional procedural history is relevant. On December 11, 2007, during prehearing proceedings, the trial court, sua sponte, directed the parties to prepare for a bifurcated hearing on the plaintiff's claim

of fraud. The court explained that "first and foremost . . . we have to determine whether or not the [defendant's pension] is in fact a marital asset. Second, we have to make a determination if it is a marital asset, was it in fact disclosed. If it was not disclosed then we have to determine whether or not that nondisclosure was fraudulent. . . . [T]hat's my . . . analysis of this."

The trial court then mentioned this court's decision in *Bender*, noted that it was issued months after the dissolution judgment,[12] and opined that it represented a change in the law. The trial court stated, therefore, that with the parties' input, it would have to decide whether the pension was distributable property by applying *Bender*, or "apply[ing] pre-*Bender* law because this is a 2001 dissolution . . . ." According to the trial court, "the fundamental question is was this particular asset a marital asset in May of 2001 . . . because if it's not marital property . . . you just don't go any further. There's no fraud. If it's not marital property and [if] it wasn't disclosed, it doesn't matter."[13]

In response to the court's directive, the plaintiff's counsel noted that the Appellate Court's decision in *Bender* was released in the year prior to the dissolution judgment,[14] and that decision similarly indicated that unvested pensions were distributable property. Moreover, in counsel's view, even prior to *Bender*, there was an obligation to disclose unvested pension benefits during a dissolution action, such that a failure to disclose them would amount to a fraudulent misrepresentation. The defendant's counsel, for his part, argued that the asset in question was not truly a pension and, in any event, it had been disclosed orally.

The trial court then reiterated its view that the "seminal question" in this case was whether the defendant's pension was "marital property in May of 2001." The court thus directed the parties to begin the hearing on the plaintiff's motion to open by limiting the evidence to that particular question, and it explained again that it would address the issue of disclosure only if the question were answered in the affirmative. Thereafter, a four day hearing was held. Consistent with the trial court's directive, the hearing was devoted to establishing the features of the defendant's pension, the contingencies to which it was subject and the way it was treated during, and affected by, the Pricewaterhouse-Coopers LLP merger. See footnote 6 of this opinion.

The plaintiff, in her posthearing brief to the court, claimed, inter alia, that the Appellate Court's decision in *Bender*, which had affirmed the distribution of an unvested pension plan, predated the dissolution judgment in this action and, therefore, required the defendant to disclose his pension on his financial affidavit. The plaintiff contended further that earlier jurisprudence also established such an obligation. The defen-

dant treated this court's decision in *Bender* as applicable, but argued that his unvested pension was factually distinguishable from the one at issue in that case.

In its memorandum of decision addressing whether the defendant's pension was property, the trial court, after making extensive findings as to the particulars of the pension, provided a detailed history of Connecticut's equitable distribution jurisprudence. It then concluded that the Appellate Court's decision in *Bender* v. *Bender*, supra, 60 Conn. App. 252, was not pertinent. According to the trial court, because the focus of the Appellate Court's decision was on whether the unvested pension at issue had been properly valued and distributed, and the parties to that case did not dispute that the pension was distributable property, the Appellate Court did not decide whether the pension was property under § 46b-81, but simply assumed that it was. Finally, the trial court concluded that this court's decision in *Bender* v. *Bender*, supra, 258 Conn. 733, was not applicable to the analysis because the release of the decision postdated the dissolution judgment by several months. Moreover, the trial court reasoned, that decision amounted to a "sea change"[15] in our equitable distribution jurisprudence that was misguided and inconsistent with earlier cases. In explaining its reasoning, the trial court provided a lengthy critique of the majority opinion in *Bender*, and it relied heavily upon a characterization of our prior equitable distribution jurisprudence that was articulated in a dissenting opinion. See *Bender* v. *Bender*, supra, 258 Conn. 767–69 (*Zarella*, *J.*, dissenting). The trial court then applied the law as the dissenting opinion described it to exist prior to this court's decision in *Bender* and concluded that the defendant's pension, in May, 2001, was not "property" that would have been subject to distribution as part of the dissolution judgment.[16]

In the final paragraph of its twenty-four page memorandum of decision, the trial court concluded further, in direct contradiction to its previous explanations of the reasons for a bifurcated hearing, that the pension, although not property, nevertheless needed to be disclosed. Specifically, the court now recognized, the dissolution court should have known about the pension when determining whether the parties' settlement was fair and when crafting its award of alimony. Accordingly, the trial court ordered that the hearing on the plaintiff's motion to open should continue. After the second part of the hearing concluded, the trial court held that no fraud had been proven.

Although several aspects of the trial court's reasoning are sound, we nevertheless disagree with both its overall approach to analyzing the issues in this case and its conclusion that the defendant's pension definitively was not distributable marital property in May, 2001. First,

we agree with the plaintiff that the real issue in this case was whether the defendant was required to disclose, and did in fact disclose, the pension during the dissolution proceedings, and not whether the pension was definitively established to be distributable property in May, 2001. Second, regardless of whether the pension was established to be distributable property at that time, its existence was a highly relevant consideration both for the plaintiff in deciding whether to agree to the proposed settlement agreement, and for the dissolution court in deciding whether to approve that agreement. Accordingly, nondisclosure, if proven, could have caused the plaintiff to act to her detriment, and full disclosure could have led to a different result in the dissolution action. Third, because the proper treatment of unvested pension benefits in dissolution actions simply was an unsettled matter in May, 2001, the trial court improperly treated it as definitively established instead of acknowledging that, in light of the state of the law at that time and the developments that were soon to follow, the plaintiff might have been awarded a share of the pension or other property in lieu of a share. As we will explain hereinafter, the trial court's unconventional analysis and its improper conclusion as to the classification of the pension distorted the remainder of the hearing on the plaintiff's motion to open and led the court to commit reversible evidentiary error. Because of that error, the court's denial of the plaintiff's motion to open was an abuse of discretion.

To begin, as the trial court eventually realized after conducting a lengthy hearing on the details of the defendant's unvested pension, the defendant unquestionably was obligated to disclose that pension to the plaintiff and the dissolution court, regardless of whether this state's appellate jurisprudence definitively had confirmed that it was distributable property by May, 2001. Pursuant to the long-standing full and frank disclosure policies and principles we have articulated; see *Weinstein* v. *Weinstein*, supra, 275 Conn. 686–87; *Billington* v. *Billington*, supra, 220 Conn. 219–22; *any* retirement or employment benefit potentially receivable by a party to a dissolution action should be disclosed on that party's financial affidavit along with all known details as to its value, vesting requirements and current status. In cases in which it is unclear or debatable whether the item at issue qualifies for distribution under § 46b-81, it is for the *trial court* to make that determination after a full and frank disclosure of the item, its relevant attributes and any contingencies to which it is subject.[17] Conversely, it is patently improper for a party to interpret the statute and case law and decide for himself or herself whether the item qualifies for distribution, and then to insulate that decision from any judicial review by failing to disclose it. When the trial court decides whether an item is distributable property, if either party is dissatisfied, he or she has the

option of appealing the matter to a higher tribunal. In this regard, we agree with the plaintiff that "[f]inancial affidavits in dissolution matters are not intended as a place for gamesmanship or even advocacy," and that affidavits require "unadulterated honesty because, in the absence of full and frank disclosure, the entire system breaks down."[18]

Next, even if a benefit such as an unvested pension is too speculative to be distributable as marital property pursuant to § 46b-81, its existence still may play into the decision-making process of the benefit holder's spouse when he or she is determining whether to accept or decline a proposed settlement offer. For instance, the plaintiff in this case, if aware that the defendant was approaching the vesting period for a pension offered by his longtime employer[19] that would provide, throughout his entire retirement, an annual payment based on 30 percent of his income in his highest earning years, might reasonably have demanded that she receive a significantly greater percentage of the couple's remaining assets than she would have had she not known about the pension. Although there were contingencies that, had they come to pass, might have disqualified the defendant from receiving the pension, the plaintiff, having familiarity with her spouse, his work history and the characteristics of his employer, might have considered those contingencies to be negligible and bargained accordingly. In short, the plaintiff could have relied on nondisclosure of the pension to her detriment, regardless of whether it ultimately was classified as distributable marital property.

Relatedly, as the trial court correctly recognized after conducting a mini-trial on whether the defendant's pension was marital property in May, 2001, even when an item is determined to be nondistributable, its existence nevertheless is a relevant consideration for a court adjudicating a dissolution action when it assesses the fairness of a settlement, distributes other property or fashions other financial orders. See, e.g., General Statutes § 46b-66 (a) (when reviewing settlement agreements for fairness and equity, court must consider, inter alia, "the financial resources . . . of the spouses"); General Statutes § 46b-81 (c) (when distributing property, court must consider, inter alia, "the opportunity of each [party] for future acquisition of capital assets and income"); General Statutes § 46b-82 (a) (when fixing alimony, court must consider, inter alia, "sources of income"); see also *Thompson* v. *Thompson*, 183 Conn. 96, 100, 438 A.2d 839 (1981) (trial court properly considered plaintiff's unaccrued pension benefits as source of future income when fixing property assignment and alimony orders).[20] Consequently, we reiterate, *all* retirement and employment benefits potentially receivable by a party to a dissolution action must be fully and frankly disclosed on that party's financial affidavits, regardless of whether they are defini-

tively established to be distributable marital property.

Finally, although we further agree with the trial court that this court's decision in *Bender* v. *Bender*, supra, 258 Conn. 733, would not apply retroactively to May, 2001, to a case that, at that time, already had reached final judgment,[21] and that the earlier Appellate Court decision in that case did not directly address the issue of how unvested pensions should be classified, we disagree that a determination of whether the defendant's pension definitively was established to be distributable property at that discrete point in time was the pertinent inquiry, or was in any way dispositive of the issues in this case. Rather, the trial court simply should have acknowledged that, in early to mid-2001, around the time the parties were engaged in settlement negotiations, the proper treatment of unvested pension benefits in dissolution actions was *an open question* in Connecticut.[22] That question was to be settled soon, however, and there were significant indications that it would be decided as it was. Instead of drawing an artificial line on the calendar after which unvested pensions suddenly became distributable property, the trial court should have considered whether, in light of that legal climate, there was a substantial likelihood that, had both the plaintiff and the dissolution court knew of the pension, the plaintiff would have refused to accept the settlement agreement and the outcome of the dissolution proceedings would have differed.

The parties' dissolution action was commenced in 2000, and disposed of in May, 2001. As early as 1981, this court held that a dissolution court properly could consider a party's unvested pension benefits when crafting property and alimony orders. *Thompson* v. *Thompson*, supra, 183 Conn. 100. In 1995, in *Krafick* v. *Krafick*, supra, 234 Conn 798–99 n.23, after concluding that *vested* pension benefits were distributable property, this court noted that, although the issue of *unvested* pension benefits was outside the scope of the decision, "the same reasoning has been applied to find that such benefits also . . . constitute property," and we cited several decisions from other jurisdictions to that effect. In that case and thereafter, in the years immediately preceding the institution of the parties' dissolution action, this court began to cite a very broad definition of property in marital cases,[23] and we expanded our interpretation of the scope of § 46b-81 to include such things as personal injury awards; *Lopiano* v. *Lopiano*, 247 Conn. 356, 367, 752 A.2d 1000 (1998); and nonexercisable stock options. *Bornemann* v. *Bornemann*, 245 Conn. 508, 518, 752 A.2d 978 (1998).[24] In a 2000 appeal to this court, a party raised the issue of whether unvested pension benefits were distributable property, but we did not resolve the issue then because of a confusing and inadequate record. See generally *Rosato* v. *Rosato*, 255 Conn. 412, 766 A.2d 429 (2001). We reiterated, however, that the issue remained an open one, and we

retained jurisdiction over the appeal with an assurance that we would decide the issue expeditiously in the event the trial court, on remand, concluded that the benefits at issue were in fact unvested. Id., 422 n.16, 425 n.19.[25]

Also around that time, at least one trial court had ordered equitable distribution of a party's unvested pension benefits. See *Bender* v. *Bender*, Superior Court, judicial district of New Haven, Docket No. FA97-0258814-S (October 8, 1998). In late 2000, the trial court's order was upheld by the Appellate Court. *Bender* v. *Bender*, supra, 60 Conn. App. 252–53. The focus of the Appellate Court's decision was on the valuation and distribution of the pension rather than its classification as marital property,[26] because the parties to that case did not dispute that the pension was distributable. Id., 254. The Appellate Court's overt acceptance of this underlying premise without, for example, ordering supplemental briefing on the matter,[27] suggested, however, that it did not view classification of the pension as property to be especially controversial.[28]

Finally, around the time the parties' marriage was dissolved, there existed a growing national consensus in favor of treating unvested pension benefits as distributable property in dissolution actions. See *Bender* v. *Bender*, supra, 258 Conn. 751 n.8 (citing decisions from thirty-one jurisdictions, as well as statutes of four states defining distributable property to include unvested pension benefits). Representatives of the national and state family law bars, when asked in early 2001 to weigh in on the matter, agreed that this was the proper approach. See id., 741 n.4 (noting that American Academy of Matrimonial Lawyers and Connecticut Bar Association Family Law Section, whom this court invited to appear as amici curiae, both contended that unvested pension was distributable property).

Consequently, in the present matter, had the defendant's pension been listed on his financial affidavit, Judge Harrigan might have followed this growing trend and awarded a portion of the pension to the plaintiff. Moreover, had the disposition of the case been delayed for several months because of the plaintiff's unwillingness to settle without receiving a share of the defendant's pension or other property in lieu of a share, that judge would have had the benefit of this court's decision in *Bender* v. *Bender*, supra, 258 Conn. 733, and would have been required to treat the pension as distributable property. Alternatively, had the case been tried and gone to final judgment with the plaintiff having sought, but not received, an interest in the pension, she might have pursued an appeal to challenge that disposition, in which case, in light of our impending decision in *Bender*, she would have prevailed. Instead of holding a straightforward hearing on the elements of fraud, acknowledging that the law regarding

distribution of unvested pensions was unsettled, considering the foregoing possibilities and determining whether the plaintiff was misled by nondisclosure to her ultimate detriment, the trial court embarked on a lengthy excursion to determine the undeterminable, namely, whether the defendant's pension definitively was or was not distributable property in May, 2001.[29] This was improper.[30]

The defendant contends that any error the trial court made in determining whether the pension was marital property is harmless in light of the fact that the court also found that the defendant orally disclosed the pension to the plaintiff and her representatives, and the court's finding, which has evidentiary support and, therefore, is not clearly erroneous, necessarily is fatal to the plaintiff's claim of fraud. For the reasons explained in part II of this opinion, the trial court's finding of disclosure must be revisited because of the court's failure to consider and/or admit important, relevant evidence. Moreover, the court's disregard of that evidence stemmed from its flawed analysis regarding whether the pension was distributable property. Accordingly, we disagree that any impropriety in the trial court's classification of the pension could not have affected its ultimate conclusion that fraud was unproven.

## II

The plaintiff's next claim concerns the trial court's ruling as to the relevance of evidence concerning the value of the defendant's pension. The plaintiff contends that the court improperly excluded important evidence in that regard, and refused to consider other relevant evidence. The defendant contends in response that, although there was some evidence of the pension's value before the trial court, that evidence was "unnecessary" in the first phase of the proceedings on the motion to open the judgment and "irrelevant" in the second phase. We agree with the plaintiff.

A trial court's ruling as to whether evidence is relevant and probative is subject to review for an abuse of discretion. *State* v. *Jackson*, 304 Conn. 383, 424, 40 A.3d 290 (2012). "Evidence is relevant if it has any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. Conn. Code Evid. § 4-1. Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long as it is not prejudicial or merely cumulative."

(Internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 496–97, 964 A.2d 73 (2009).

The following additional procedural history is relevant. During the first phase of the proceedings, the trial court directed the parties to focus on the specific, narrow issue of whether the defendant's pension qualified as marital property pursuant to § 46b-81 at the time of the dissolution judgment.[31] Accordingly, the parties addressed that issue alone, and any evidence presented as to the pension's value was peripheral and incomplete. Miller, an actuarial and pension expert who testified on the plaintiff's behalf, did not offer a firm opinion as to the pension's value. Rather, he testified only as to whether, as a general or conceptual matter, the pension was susceptible of being valued,[32] and he offered a "guesstimate" that at the end of 1999, it was worth approximately $500,000.

At the conclusion of the first phase of the motion proceedings, the trial court held that the pension was not marital property subject to distribution. Thereafter, during the second phase, conducted approximately nine months later, the court ruled, sua sponte, that at that stage of the trial, any evidence of the value of the pension, whether proffered by either party, was irrelevant and immaterial and would not be admitted. In light of that ruling, the plaintiff made an offer of proof for the record, which included her disclosure of Miller as an expert witness and a report that Miller had prepared[33] to value the pension, in which he opined that it had a substantial value, in excess of $1 million.[34] The court precluded the proffered evidence, again holding that it was irrelevant and immaterial to the second phase of the proceedings.

After the second phase, the trial court concluded that the plaintiff had not proven fraud, essentially adopting the defendant's account of disclosure and discrediting the plaintiff's account of nondisclosure. The plaintiff subsequently filed a motion for articulation wherein she requested, inter alia, that the trial court articulate whether it had made any determination as to the value of the defendant's pension at the time of the dissolution judgment and, if so, what that value was. Following the trial court's denial of the plaintiff's motion, this court, upon review, ordered the trial court to provide the requested articulation. In the articulation that followed, the trial court explained that it considered the plaintiff's request to be a "red herring" because the court unequivocally had found that the pension was not property at the time of the dissolution judgment. According to the court, "[t]he clearly articulated purpose of the first phase of the trial was *not* to determine the value of the [pension], rather it was to determine if the [pension] should be construed as a marital asset at the time of the decree dissolving the marriage. This question was answered in the negative." (Emphasis in original.) Fur-

thermore, the court explained, "[a]ssuming arguendo that [it] was looking to determine the value of the [pension] (*which it was not*)," there was "no credible evidence as to [the] value of the [pension] as of May 25, 2001, the date of the dissolution of the [parties'] marriage." (Emphasis in original.) In this regard, the court noted that the valuation provided by Miller in the first phase of the motion proceedings was only a " 'guesstimate' " that the court did not find to be credible.

We agree with the plaintiff that the court's evidentiary rulings, whereby it refused to admit the most probative evidence of the pension's value or to consider and determine that value at all, were improper.[35] First, to prevail on her motion to open the judgment, the plaintiff needed to prove that the defendant misrepresented the amount of property he owned by failing to disclose the existence of the pension and all of its salient features; see footnote 18 of this opinion; and that she relied on that misrepresentation to her detriment by agreeing to a settlement to which she would not have agreed had she known all the details about the pension. See *Weinstein* v. *Weinstein*, supra, 275 Conn. 685; *Gelinas* v. *Gelinas*, supra, 10 Conn. App. 173. Because of the absence of *any* documentary proof directly evidencing disclosure of the pension by the defendant and knowledge of it by the plaintiff, the trial court decided these issues largely on the basis of its assessment of the parties' credibility. In short, the court credited the defendant's version of events and discredited the plaintiff's version. If, however, the trial court were to have determined, on the basis of a complete evidentiary record, that the pension had considerable worth; see footnote 34 of this opinion; that determination could have severely undermined the court's finding that the plaintiff had full knowledge of the pension, yet simply chose not to pursue any interest in it or some alternative compensation for relinquishing any such interest. Similarly, a finding of substantial value may well have changed the trial court's assessment of the defendant's account of full and frank disclosure to the plaintiff, namely, disclosure not only of the pension's existence, but of *all* its salient features, including its value.[36]

In connection with her motion to open, the plaintiff also needed to show that the outcome of a new trial probably would differ. *Weinstein* v. *Weinstein*, supra, 275 Conn. 685. Because of the court imposed bifurcated hearing and the trial court's improper conclusion, after the first phase, that the pension definitively was not property in May, 2001, the plaintiff was foreclosed from arguing that, in light of the uncertain state of the law at that time, the pension, if fully disclosed to the dissolution court, may well have been treated as distributable property. In this event, the value of the pension was relevant to the question of whether the plaintiff would have been awarded a substantially different portion of the parties' total assets. Conversely, even if the plaintiff

could not show that the dissolution court would have treated the pension as distributable property, the value of the pension was relevant to the question of whether that court, had it known of the pension, still would have found the parties' separation agreement to be fair and equitable and approved it. The trial court, without considering any evidence of value, concluded that Judge Harrigan's finding in this regard would not have differed. We do not agree. Particularly, if the pension had a present value in excess of $1 million, as Miller, the plaintiff's expert, intended to testify; see footnote 34 of this opinion; it is questionable whether Judge Harrigan would have approved the parties' agreement, which basically endeavored to give each party approximately one half of the remaining marital property.[37]

For the foregoing reasons, we conclude that the trial court's evidentiary rulings, which flowed from its improper analysis regarding whether the pension was distributable property, were improper. Additionally, the court's finding that there was no fraud, which flowed from those evidentiary rulings, also is fatally flawed.[38] Consequently, the trial court's denial of the plaintiff's motion to open was an abuse of discretion.

## III

The plaintiff's last claim is that the trial court improperly required her to bear the burden of proving fraud under the circumstances of this case. According to the plaintiff, once it is established that a party to a dissolution action has failed to list a substantial asset either on his or her financial affidavit or in open court, the burden should shift to that party to prove, by clear and convincing evidence, either the absence of fraud or that the nondisclosure was harmless. The plaintiff concedes that she did not raise this claim at trial, but asks that this court find plain error in the trial court's failure to allocate the burden of proof as she suggests. The defendant responds that there is no plain error for this court to rectify because the trial court correctly applied existing law that required the plaintiff to bear the burden of proving the elements of fraud. We agree with the defendant.

"[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in

which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . In *State* v. *Fagan*, [280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007)], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 76–78, 60 A.3d 271 (2013).

We agree with the defendant that the trial court correctly allocated and applied the burden of proof that, for decades, has been part of our jurisprudence governing motions to open dissolution judgments on the basis of fraud, and furthermore, these cases have not distinguished between fraud based on misrepresentation and that based on nondisclosure. See, e.g., *Weinstein* v. *Weinstein*, supra, 275 Conn. 684–85; *Billington* v. *Billington*, supra, 220 Conn. 215, 217–18; *Jucker* v. *Jucker*, 190 Conn. 674, 675, 677, 461 A.2d 1384 (1983); see also *Terry* v. *Terry*, 102 Conn. App. 215, 223, 925 A.2d 375, cert. denied, 284 Conn. 911, 931 A.2d 934 (2007). The plaintiff did not object to the imposition of these standards at trial, nor did she suggest that another framework should apply. Indeed, she concedes on appeal that, under existing law, she bore the burden of proving the elements of fraud by clear and convincing evidence. In sum, the plaintiff does not contend that the court improperly applied existing law, but rather, she requests that we create and adopt a new exception to that law,

and then conclude that the trial court improperly failed to apply that exception.

As the preceding explanation of the plain error doctrine makes clear, however, a prerequisite to its invocation is the trial court's commission of an obvious and serious error. We cannot find plain error under the circumstances of this case because there is no true error to correct. "[T]he plain error doctrine should not be applied in order to review a ruling that is not arguably incorrect in the first place." *State* v. *Pierce*, 269 Conn. 442, 453, 849 A.2d 375 (2004); id. (holding that Appellate Court improperly invoked plain error to raise supplementary issues when "trial court acted pursuant to a presumptively valid statute in accordance with its express provisions"). As we previously have explained, when a trial court has "follow[ed] [an] established rule of law . . . [it] can hardly be said to have committed plain error"; (internal quotation marks omitted) *Williamson* v. *Commissioner of Transportation*, 209 Conn. 310, 319, 551 A.2d 704 (1988); id. (no plain error when trial court instructed jury, in accordance with long line of cases applying General Statutes § 13a-144, that it was plaintiff's burden to prove defective highway was sole proximate cause of her injuries); and "[i]t is not plain error for a trial court to follow Connecticut law." *Sorrentino* v. *All Seasons Services*, 245 Conn. 756, 768, 717 A.2d 150 (1998); id., 766–68 (rejecting defendant's unpreserved claim that it was plain error for court to instruct jury on plaintiff's burden of proof in wrongful discharge case in accordance with standard articulated in state cases). When a party's claim is dependent on the recognition of a new legal standard, plain error cannot apply. *Feen* v. *New England Benefit Cos.*, 81 Conn. App. 772, 778, 841 A.2d 1193 (no plain error where appellant's claim was contingent on unsettled legal principles), cert. denied, 269 Conn. 910, 852 A.2d 739 (2004). We conclude, therefore, that the trial court did not commit plain error by placing the burden of proving fraud on the plaintiff in accordance with established Connecticut case law.

To summarize, the trial court improperly concluded that the defendant's unvested pension, in May, 2001, definitively was not distributable marital property pursuant to § 46b-81. Because the court employed an incorrect legal analysis to conclude that the pension was not property, it improperly refused to admit and/or consider evidence of the pension's value, evidence which was relevant to the issues of whether it had been disclosed and whether it would have affected the outcome of the dissolution action. Consequently, the trial court's denial of the plaintiff's motion to open was an abuse of discretion. The trial court applied the correct burden of proof to the plaintiff's claim, and accordingly, did not commit plain error in that regard.

The judgment is reversed and the case is remanded

for further proceedings consistent with this opinion.

In this opinion NORCOTT, PALMER, EVELEIGH and McDONALD, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes (Rev. to 2001) § 46b-81 provides in relevant part: "(a) At the time of entering a decree . . . dissolving a marriage . . . the Superior Court may assign to either the husband or wife all or any part of the estate of the other. . . .

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

[3] Subsequently, the plaintiff amended her September 15, 2005 motion to allege that the defendant had failed to disclose the existence of a second retirement plan. The defendant ultimately conceded that he inadvertently had failed to disclose this second plan, which had comparatively little value, and its disposition is not a subject of this appeal.

On October 11, 2005, the plaintiff filed another motion to open and modify the dissolution judgment as it pertained to child support. On February 19, 2008, she filed a motion for contempt relating to the defendant's alleged violation of a term of the property distribution portion of the parties' separation agreement. The trial court's disposition of these two motions also is not at issue in this appeal.

[4] Hereinafter, references to the trial court are to *Shay, J.*, unless otherwise noted.

[5] It is not clear why the trial court employed this approach to trying a fraud claim. As explained more fully hereinafter, at the conclusion of the first phase, the court concluded that the pension was not distributable property, but that the defendant should have disclosed it anyway. The court then held the second phase of the trial which, it previously had informed the parties, would be unnecessary in the event the pension was not found to be property.

[6] Price Waterhouse and Coopers & Lybrand, LLP, merged in 1998 to form PricewaterhouseCoopers LLP. The defendant worked for Price Waterhouse for all but one year between 1980 and the time of the merger, and he was named a partner of that firm on July 1, 1991. Postmerger, he remained a partner in the newly formed entity, PricewaterhouseCoopers LLP.

[7] General Statutes § 46b-66 (a) provides in relevant part: "In any case . . . where the parties have submitted to the court an agreement concerning the custody, care, education, visitation, maintenance or support of any of their children or concerning alimony or the disposition of property, the court shall inquire into the financial resources and actual needs of the spouses and their respective fitness to have physical custody of or rights of visitation with any minor child, in order to determine whether the agreement of the spouses is fair and equitable under all the circumstances. If the court finds the agreement fair and equitable, it shall become part of the court file, and if the agreement is in writing, it shall be incorporated by reference into the order or decree of the court. If the court finds the agreement is not fair and equitable, it shall make such orders as to finances and custody as the circumstances require. . . ."

While changes have been made to § 46b-66 since the time of the proceedings here; see, e.g., Public Acts 2001, No. 01-135, § 1; Public Acts 2005, No. 05-258, § 1; subsection (a) has remained unchanged. For purposes of convenience, we refer to the current revision of the statute.

[8] General Statutes (Rev. to 2001) § 46b-82 provides in relevant part: "At the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other, in addition to or in lieu of an award pursuant to section 46b-81. . . . In determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider the length of the marriage, the causes for the . . . dissolution of

the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment.''

[9] Apparently, Artabane intended to testify in the dissolution proceedings as a character witness for the defendant, in the event such testimony was necessary.

[10] The plaintiff filed a motion to reargue, which the court denied without substantive discussion.

[11] We recently altered the standard for a party to obtain a new trial on the basis of fraud to require that party to show only a "reasonable probability" that the result of a new trial will be different, rather than a "substantial likelihood," as our previous case law had held. See *Duart* v. *Dept. of Correction*, 303 Conn. 479, 491, 34 A.3d 343 (2012). A reasonable probability means "a probability sufficient to undermine confidence in the outcome," or that the nondisclosed information "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the [judgment]." (Internal quotation marks omitted.) Id., 492.

[12] This court's decision in *Bender* v. *Bender*, supra, 258 Conn. 733, was released on December 18, 2001, approximately seven months after the judgment of dissolution was rendered in the present case.

[13] In a subsequent memorandum of decision, the trial court explained why "it was appropriate to divide the hearing into two distinct phases." According to the court, "a determination as to whether or not the [pension] was marital property *at the time of the decree dissolving the marriage* was a distinct, potentially definitive issue . . . . Accordingly, phase I would deal solely with the issue of whether or not the [pension] in question was marital property at the time of the decree. In the event that the court were to conclude that, based upon the evidence, the [pension] was not marital property, the inquiry as to that issue would for all intents and purposes end. On the other hand, if there was an affirmative finding, the inquiry would move to phase II. In that event, the court would be called upon to decide whether or not the [defendant] failed to disclose the property in question . . . whether or not the nondisclosure was fraudulent, and if so, would that fact likely have altered the underlying judgment." (Emphasis in original.)

[14] The Appellate Court's decision in *Bender* v. *Bender*, supra, 60 Conn. App. 252, was released on October 3, 2000, approximately eight months prior to the dissolution judgment in the present case.

[15] A "sea change" is defined as "a striking change" or "any major transformation or alteration." Random House Unabridged Dictionary (2d Ed. 1993).

[16] The trial court described Justice Zarella's dissenting opinion in *Bender* as "well reasoned," and stated that it "agree[d]" with the analysis therein. When subsequently discussing its opinion with the parties, the trial court explained that, although it had "great respect" for this court, it "also [had] great respect for some individual members of the court . . . ." The trial court indicated that it accepted Justice Zarella's view of pre-*Bender* jurisprudence; see *Bender* v. *Bender*, supra, 258 Conn. 767–69; and it concluded, therefore, that "what this case turned on was the calendar."

[17] Both parties' counsel from the dissolution action appear to have understood this requirement. Attorney Piazza testified that, in 2000, when he had clients with unvested assets, he always listed those assets on the clients' financial affidavits. Attorney Burdett testified that he counseled clients to include on their affidavits assets with doubtful status and that he had so advised the defendant, but also that the defendant was a proactive client with clear opinions who made the ultimate decision not to list the pension.

[18] We take this opportunity to emphasize that full and frank disclosure of a pension should include not only the facts of its existence and vesting status (i.e., the total time of employment needed to vest and the time the employee spouse already has completed), but also any readily available information pertaining to the calculation of benefits and/or the present value of those benefits. Cf. *Weinstein* v. *Weinstein*, supra, 275 Conn. 690 n.12 (to comply with requirement of full and frank disclosure, defendant should have disclosed both fact of ownership of asset and accurate assessment of asset's worth). Moreover, disclosure of all relevant information that is available should be clear and overt, and not merely discoverable or inferable through careful analysis of a mass of documentation. Id., 690 n.12, 693 n.14. In this regard, we reject the defendant's contention that vague, general references in the PricewaterhouseCoopers LLP partnership agreement to retired partners' receipt of "payments" or "participat[ion] in [n]et [p]rofits," or the single word "pension," in a schedule appended to some of the many drafts of the

parties' separation agreement, constitute full and frank disclosure of the pension and all of its relevant attributes. Notably, the trial court's memorandum of decision does not cite these documents as evidence of disclosure.

[19] See footnote 6 of this opinion.

[20] The dissenting justice questions whether *Thompson* supports the proposition that unvested pension benefits must be disclosed because his examination of the record and briefs in that case reveals that it actually involved the unaccrued portion of a vested pension, rather than an unvested pension. He contends that subsequent decisions of this court describing *Thompson* differently have misinterpreted its holding. Regardless of whether this is the case, *Thompson* still stands for the proposition that benefits that are not distributable property, for whatever reason, may be taken into account by a court fashioning financial orders in a dissolution proceeding. Such benefits, therefore, need to be disclosed. Accordingly, *Thompson* is not, as the dissent states' "inapposite."

[21] Although the general rule is that judicial decisions may apply retroactively to govern disputes whose operative facts predate those decisions; see *Ostrowski* v. *Avery*, 243 Conn. 355, 377 n.18, 703 A.2d 117 (1997); retroactive application nevertheless is limited to cases that are pending and, therefore, have not resulted in final judgments. *Marone* v. *Waterbury*, 244 Conn. 1, 11 n.10, 707 A.2d 725 (1998). In May, 2001, the parties' dissolution action had gone to final judgment.

We agree, therefore, with the trial court that *Bender* did not apply retroactively to the parties' dissolution action. We disagree, however, with the trial court's reasoning. In concluding that *Bender* did not apply retroactively, the trial court improperly applied the law applicable to statutory amendments rather than judicial decisions.

[22] We disagree with the defendant's suggestion that, prior to 2001, the Appellate Court had held that employment benefits were not property due to their unvested status. In *Wendt* v. *Wendt*, 59 Conn. App. 656, 674–76, 757 A.2d 1225, cert. denied, 255 Conn. 918, 763 A.2d 1044 (2000), the Appellate Court upheld the trial court's ruling that certain pension benefits were not distributable marital property because they represented, in their entirety, compensation for postdissolution employment services, and not because they were unvested per se. See also *Hopfer* v. *Hopfer*, 59 Conn. App. 452, 458, 757 A.2d 673 (2000) (same reasoning, as to unvested stock options).

[23] See *Lopiano* v. *Lopiano*, 247 Conn. 356, 365, 752 A.2d 1000 (1998) (The court defined "property as the term commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate. It extends to every species of valuable right and interest, and includes real and personal property, easements, franchises, and incorporeal hereditaments . . . ." [Internal quotation marks omitted.]), quoting Black's Law Dictionary (6th Ed. 1990) p. 1216; see also *Simmons* v. *Simmons*, 244 Conn. 158, 165, 708 A.2d 949 (1998) (same); *Krafick* v. *Krafick*, supra, 234 Conn. 794 (same).

[24] But see *Simmons* v. *Simmons*, 244 Conn. 158, 164, 708 A.2d 949 (1998) (medical degree not property subject to equitable distribution).

To dispute our assertion that, around the time of the parties' divorce, our case law was trending toward a broader conception of what constituted distributable property, the dissent cites *Krause* v. *Krause*, 174 Conn. 361, 387 A.2d 548 (1978), and *Rubin* v. *Rubin*, 204 Conn. 224, 527 A.2d 1184 (1987). At the time of the judgment in the parties' dissolution action, the decisions in *Krause* and *Rubin* were twenty-three and fourteen years old, respectively, and, as such, do not speak as strongly to the direction of our case law in 2001 as the cases we cite herein, which were decided in 1998.

[25] The decision in *Rosato* v. *Rosato*, supra, 255 Conn. 412, was released on March 6, 2001.

[26] When dividing resources in a dissolution action, "[t]here are three stages of analysis regarding the equitable distribution of each resource: first, whether the resource is property within § 46b-81 to be equitably distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties (distribution)." *Krafick* v. *Krafick*, supra, 234 Conn. 792–93.

[27] In its opinion, the Appellate Court expressly stated that classification of the pension was not at issue because "[n]either party challenges the authority of the court to award nonvested pension rights." *Bender* v. *Bender*, supra, 60 Conn. App. 254.

[28] Arguably, the Appellate Court's acceptance of the premise that the unvested pension at issue was property pursuant to § 46b-81, a determination that was an essential prerequisite to the valuation and distribution of the pension; see footnote 26 of this opinion; was a controlling precedent to be followed by the dissolution court. *Bender* was not a case in which an appellate tribunal assumed, without deciding, that a subsidiary legal prerequisite was established because the claim whose success depended on that prerequisite would fail in any event. See, e.g., *Schumann* v. *Dianon Systems, Inc.*, 304 Conn. 585, 621, 43 A.3d 111 (2012) (assuming, without deciding, that balancing

test for determining whether public employee speech was constitutionally protected was applicable before concluding that plaintiff could not prevail under that test). In such instances, the assumed point is not essential to the court's ultimate holding and, therefore, it creates no binding precedent. We recognize, however, that the precedential effect of a case is substantially diminished when the legal point involved was decided with little or no argument. See 20 Am. Jur. 2d 519, Courts § 137 (2005).

[29] The trial court's decision to paint this court's decision in *Bender* v. *Bender*, supra, 258 Conn. 733, as marking a bright line on the calendar, prior to which an unvested pension definitively was not property and after which it was, stemmed from the trial court's characterization of *Bender* as a surprising reinterpretation of § 46b-81 that upended earlier jurisprudence. As we have explained herein, we disagree with that characterization. Additionally, in *Bender* itself, we stated that our decision to treat unvested pension benefits as property rested on a theme running throughout our prior case law; id., 748, 751; and made clear that we had not "overruled our prior cases defining property for purposes of our equitable distribution statute . . . [but rather, had] built upon their foundation." Id., 753. Although *Bender* did break new ground and adopt a more nuanced approach toward classification of assets as marital property; see *Mickey* v. *Mickey*, supra, 292 Conn. 625–28; such incremental steps in jurisprudential development are a hallmark of the common law and, for the reasons we have explained, we do not consider this court's holding in *Bender* to have been a particularly surprising one.

Instead of accepting this court's view of its own § 46b-81 jurisprudence, as stated in *Bender*, the trial court enthusiastically embraced an alternative description of that jurisprudence that was set forth in the dissenting opinion in that case. See *Bender* v. *Bender*, supra, 258 Conn. 764–79 (*Zarella, J.*, dissenting). The trial court also devoted several pages of its memorandum of decision to critiquing the majority opinion in *Bender*, posing rhetorical questions about the implications of the holding and making clear that it much preferred, and even "agree[d]" with, the reasoning of the dissenting opinion. In the trial court's view, when faced with a majority and dissenting opinion on a matter, "the best course for the court is to attempt to reconcile both positions, if possible, and then to apply that reasoning to the particular facts at . . . hand."

Our disapproval of this aspect of the trial court's decision cannot be overstated. It is axiomatic that a dissenting opinion, by its very nature, represents a minority of the court's *disagreement* with the law as established by the majority opinion and, therefore, is not an authoritative ruling to be applied by a lower court. See *Arar* v. *Ashcroft*, 585 F.3d 559, 581 n.14 (2d Cir. 2009) ("[d]issents by their nature express views that are not the law"), cert. denied, 560 U.S. 978, 130 S. Ct. 3409, 177 L. Ed. 2d 349 (2010); *Kennedy* v. *Walker*, 135 Conn. 262, 274, 63 A.2d 589 (1948) (dissenting and concurring opinions "[do] not represent authoritative law"), aff'd, 337 U.S. 901, 69 S. Ct. 1046, 93 L. Ed. 1715 (1949), superseded by statute on other grounds as stated in *State* v. *Sanabria*, 192 Conn. 671, 474 A.2d 760 (1984); *State* v. *Hernaiz*, 140 Conn. App. 848, 855, 60 A.3d 331 (refusing defendant's request to rely on dissenting opinions contrary to established law), cert. denied, 308 Conn. 928, 64 A.3d 121 (2013). Additionally, once this court has finally determined an issue, for a lower court to reanalyze and revisit that issue is an "improper and fruitless" endeavor. *State* v. *Shipman*, 142 Conn. App. 161, 166, 64 A.3d 338, cert. denied, 309 Conn. 918, 70 A.3d 41 (2013); see also *Cannizzaro* v. *Marinyak*, 139 Conn. App. 722, 734, 57 A.3d 830 (2012) (explaining that it is not lower court's province to reevaluate Supreme Court precedent), cert. granted on other grounds, 308 Conn. 902, 60 A.3d 286 (2013). The trial court's reliance on a dissenting opinion as a source of law was improper. Unfortunately, the trial court's gratuitous editorializing regarding the majority opinion in *Bender* v. *Bender*, supra, 258 Conn. 733, strongly suggests a fundamental misconception of its role in a hierarchical system of justice.

[30] The dissent contends that the trial court's preliminary focus on determining whether the defendant's pension, *in May, 2001*, was definitively established to be distributable property pursuant to § 46b-81, was demanded by the plaintiff's theory of her case, as evidenced

by her motion to open which, in part, sought relief pursuant to the parties' settlement agreement. We do not agree. Although, for the reasons we explain in this opinion, the legal status of unvested pensions in and around 2001 was generally relevant, focusing the inquiry on the precise date of the parties' settlement agreement and the dissolution of their marriage was inappropriate and, further, was not mandated by the plaintiff's motion to open. In fact, the plaintiff argued in her motion that: (1) had she known about the pension, she never would have entered the settlement agreement; and (2) unvested pensions were " 'property or assets' " subject to disclosure and distribution pursuant to § 46b-81 "at the time of the events outlined" in the motion, which events spanned from 2000 through 2004. Finally, it is not clear that the parties, when addressing nondisclosure of "a property interest, the effect thereof or an important characteristic thereof" in the penalty clause of their settlement agreement, intended that phrase to be defined strictly as any property definitively established by Connecticut appellate jurisprudence to be distributable pursuant to § 46b-81.

[31] According to the trial court, the first phase of the hearing was focused on the classification stage of "the [three stage] *Krafick* model." Valuation and distribution are the other two stages of that model. See footnote 26 of this opinion.

[32] While testifying, Miller referenced the personalized projection report that PricewaterhouseCoopers LLP, had made available to the defendant in April, 2000, and that report was admitted into evidence. Miller explained that the report, employing certain assumptions as to the vesting date, discount rate, earnings growth and life expectancy, stated that the defendant's future pension benefits, at the end of 1999, had a present value of $3,839,117. The projection report did not take into account the contingencies to which the defendant's ultimate receipt of the pension was subject, however, nor did it specify which portion of the present value was attributable to services that were yet to be rendered, postdissolution.

[33] Miller completed his report subsequent to the first phase of the motion proceedings.

[34] The plaintiff's expert witness disclosure indicated that Miller would testify about, inter alia, the present value of the defendant's pension as of the date of the dissolution judgment. Specifically, Miller would have testified consistently with his report that, as of that date, the defendant had earned an annual benefit of $105,988, and that the present value of that income stream was in excess of $1 million. Miller's report details his methodology, the information on which he relied and the assumptions he employed.

[35] The dissent contends that the following analysis is inappropriate because the plaintiff, at trial, did not proffer her evidence of the pension's value along with a detailed explanation of its relevance to the issues before the court, specifically arguing that the evidence would discredit the defendant's testimony regarding those issues. According to the dissent, therefore, we improperly hold that the evidence was admissible on an unpreserved basis. The trial court, however, did not even wait for the plaintiff to offer the evidence, or for the defendant to object to it, before ruling, sua sponte, that no evidence of value would be admitted, although *both* parties had prepared such evidence and intended to present it. In the highly unusual circumstances of this case, wherein the trial court imposed its own theoretical framework on the litigation, unexpectedly altered that framework midstream and, then, proactively ruled on evidentiary objections that had not been made, we decline to penalize the plaintiff for not making a textbook objection to the trial court's sua sponte ruling. Because, as we explain hereinafter, valuation evidence clearly was relevant to both the elements of fraud and the factors governing a motion to open on the basis of fraud, the trial court's ruling likely invoked confusion.

[36] Pursuant to their separation agreement, the parties had endeavored to divide their assets equally. At the time of the dissolution, they stipulated that their former marital home was worth $550,000, and their final financial affidavits reflect other divisible assets of approximately $1.5 million. Accordingly, an additional asset valued in excess of $1 million was extremely significant.

[37] In the dissent's view, Miller's report and testimony properly were excluded because, due to the report's analytical deficiencies, it was

entirely irrelevant and hence inadmissible. The dissent contends that the trial court, even had it considered the evidence, necessarily would not have found it credible. According to the dissent, even though Miller explicitly listed a number of uncertainties regarding the pension, he did not actually take them into account.

The trial court did not reject the cited evidence on the rationale set forth by the dissent, and even the defendant does not suggest such a sweeping argument. In any event, we disagree with the dissent's assessment of the report, which was prepared by a highly qualified expert, with degrees in mathematics and actuarial science, who specialized in evaluating employee pensions and their present values. The dissent speculates that, although Miller articulated several contingencies to which the defendant's receipt of his pension was subject, he did not actually take them into account. A more plausible reading, however, is that he did take them into account, but did not believe they warranted the excessively high discount rate chosen by Mark S. Campbell, the defendant's expert. For example, the report quotes PricewaterhouseCoopers LLP documents and reports evidencing the firm's commitment to the pension and the firm's financial health, and it discusses the defendant's lengthy employment history with the firm, including almost one decade as a partner, in support of the conclusion that he was unlikely to be terminated prematurely. Additionally, because the trial court did not permit Miller to testify, he never had the opportunity to explain the reasoning behind his report, nor to explain why he disagreed with the opposing report, which the dissent simply accepts unquestioningly. Miller identifies several problems with Campbell's estimate of the pension's present value, not least among them that it was in "direct contrast" to the projection report prepared by PricewaterhouseCoopers LLP, and made available to the defendant, in April, 2000. In crediting Campbell's report over Miller's, the dissent essentially is finding facts, a task which clearly is not the function of an appellate tribunal. *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 106, 84 A.3d 828 (2014).

[38] The dissent criticizes us for failing to analyze directly whether the trial court's factual finding that the pension was disclosed is clearly erroneous. Our response to that criticism is that the plaintiff has not made that argument, but rather, has claimed evidentiary error.